We'll hear argument this morning in Case No. 15-1191, Loretta Lynch, Attorney General v. Morales-Santana. Mr. Kneedler. Mr. Chief Justice, and may it please the Court, the United States Constitution does not confer U.S. citizenship on anyone born outside the United States. Rather, pursuant to its plenary authority under Article I of the Constitution, it is for Congress to determine which categories of such persons should be granted U.S. citizenship by statute. In doing so, Congress has always required that the persons involved have a demonstrated and sufficient connection to the United States, either in themselves or through their parents, to warrant the conferral of citizenship because citizenship carries with it attendant duties and rights on the part of the individual and important duties of protection and obligation on the part of the United States government. This case concerns the framework under the Immigration and Nationality Act of 1952, as originally enacted, for granting citizenship to persons outside the United States as of the date of their birth. Other provisions deal with the granting of citizenship later in life. Those were open to Respondent or his father in this case, but were not taken advantage of. In particular, this case concerns the granting of citizenship to children born out of wedlock abroad, a situation in which this Court's cases make clear that mothers and fathers are not typically similarly situated with respect to their legal status concerning the child at the moment of birth. The general rules for citizenship at birth are set out in 8 U.S.C. 1401, and I'm referring to the Act as originally enacted. It was revised in 1986. If both parents were U.S. citizens, then a child born outside the United States would be a citizen of the United States as long as one of the parents had resided in the United States for any period of time. Congress deemed that to be a sufficient connection to the United States, given that both parents are citizens. On the other hand, if one parent was a U.S. citizen and one parent was an alien, Congress had a markedly different approach. The U.S. citizen parent had to reside to have resided in the United States for 10 years, five of which were after reaching the age of 14. Congress evidently determined that because such a child would have competing claims of allegiance, that a greater residency was required for the parent to establish the connection to the United States. Is that an argument we heard much about in the Flores v. R. case? It was made at the oral argument in Flores v. R., but we think it's also evident from the face of the statute. As this Court said in the Nguyen, with respect to another argument that the Court addressed there, it's important for the Court itself to look at the structure, text, and operation of the statute to see what the purpose is. In Flores v. R., the government spent most of its argument talking about the differential treatment primarily on the grounds of statelessness. Right. And here your argument, the thrust of your argument is somewhat a different need to ensure sufficient ties. We're making both arguments, and we did argue in Flores v. R. that there should be a connection to the United States and that the statutory framework is set up that way. It's true that our emphasis was on statelessness, but we are now arguing, and again, we think it's entirely evident from the face of the statute that what these provisions are after is a connection to the United States. Why aren't men and women who are parents similarly situated with respect to their affiliation, their attachment to U.S. values? I mean, there's no reason to think that a man is less — has less of a sense of U.S. belonging than a woman. Right. And we're making no such argument. The point is that where you have — at the moment of birth, the mother, as this Court recognized in the Nguyen case and has recognized in cases like Lehrer v. Robertson in the domestic context, the mother is the only legally recognized parent. There are many cases, especially in generations back when this law was on the books, where the mother — the birth certificate came sometime after the child was born, and both the father's name and the mother's name might be on it. So it is — it's not — the moment of birth doesn't necessarily tell you who is the mother if she — if there's no birth certificate, and the child, when they get the birth certificate, both names are on it. But I think this Court's decision in Nguyen and the State statutes that we identify in a footnote in our brief are premised on the proposition that the identity of the mother and her relationship to the child will be known by virtue of the birth alone, or at least will be known in the overwhelming majority of cases. In that situation, there is only one parent. There is not a competing claim of citizenship to a — competing claim of allegiance to another country through another parent. On the other hand, when the father legitimates, at that point, you have two parents, and in the situation where they are of different nationalities, then you are put in the situation where there are competing claims of citizenship. KAGANS Why do we look, Mr. Kneedler, to the moment of birth? Why shouldn't we look to the moment when citizenship is sought? KNEEDLER Because this — this statutory provision specifically deals with citizenship at birth. And the statute — that's its caption, 1409A, with respect to the situation where the father legitimates, says the child shall be a citizen as of birth. And it's important to understand exactly what's operating here. At the moment of birth, again, the child only has one — one parent. When the father legitimates, what Congress has done generously, one could say, but at least sensibly, is to say, we will treat the couple as if they were married at the moment of birth. They're giving retroactive application to the legitimation so that the — so that the child is treated as the child of married parents at that point. If the — if the legitimating father is a U.S. citizen, in that situation, you would have two U.S. citizen parents, and the very generous rule for U.S. citizens in that situation. Kennedy But Nguyen was more a matter of — of proof, whereas this case, as Justice Ginsburg indicates, is a question of which — does the child have sufficient ties to the country? This is quite a different — quite a different proposition that the two cases address, it seems to me. Kneedler Two things about that. This Court's decision, Nguyen, had two — had identified two separate interests. One was the proof of paternity, but the other was recognizing the connection to the United States. The connection to the United States in a situation like this has two steps. What is the relationship of the child to the parent? And Nguyen was concerned about establishing that relationship that, in some formal sense and also underlying it, a real sense of establishing that relationship. This case deals with the relationship of the parent to the United States. Sotomayor The problem is, with the exception that's been created for unwed citizen mothers, the first prong, the interest of the connection to the United States doesn't exist, because the statute doesn't require any connection to the United States except U.S. citizenship. She could have been born, lived here a day, and moved somewhere else, and she would automatically confer. Kneedler No, not under the 1952 Act. Under the 19 — that was true under the 1940 Act. Under the 1952 Act, it's continuous presence for one year. But Congress deemed that to be basically somewhere in between the two U.S. citizen parent situation, in which any period of residency was okay, and the mixed — and the mixed nationality situation, where Congress said it had to be 10 and 5. Congress chose a period somewhere in between, one year of continuous — Sotomayor For an unwed father who has legitimate ties to the child. Kneedler Because in that — in that situation, there are two — there are two parents. The argument is not that the father's ties are less. It's that there are competing ties. And Congress wanted to make sure that the — that the strength of the U.S. citizen's ties were sufficient, that they would outweigh or at least counteract, or Congress could be sufficiently confident of a tie to the United States to grant citizenship in that — in that situation. And again, we know — Kagan Why couldn't that have been done, Mr. Kneedler? Why couldn't these objectives have been served through entirely gender-neutral language? For example, I know that there was a proposal that the Secretary of State made earlier than this statute was passed in the 1930s, which talked just about legal parents, which didn't refer to mothers and fathers at all. Kneedler Right. I mean, several things about that. That — I don't think there's a claim in this case that Respondent would benefit from reading the statute in that manner, because I don't think there's any question that he had citizenship and a legal parent when he was born. But beyond that — Kagan Well, but that would get rid of the gender inequality that's at the heart of his complaint, whether or not he in the end benefits from it. The question here is whether the statute makes — constitutes a violation of equal protection. One question we ask when we think about a question like that is, could Congress have written the statute? Could Congress have served its objectives in an entirely gender-neutral way? And it seems as though here we have the — the Secretary of State presented a statute to Congress that actually did that. Kneedler Yes. But as was pointed out at the time and as we point out in our brief, while that statute on its face looked gender-neutral, in fact, it would have operated in exactly the same way as the statute that Congress enacted operated, because — and no one has really taken serious issue with the proposition we have in our brief, that at the moment of birth it was the overwhelming rule that the mother was the only legally recognized parent. So in that — it would have operated in essentially the same way. And let me — let me come at this in a slightly different direction. If — when you have one parent, the mother in this case, she gets to make all of the pertinent decisions about the child, where they will live, where they will be domiciled, situations like that. When a father legitimates, he does not — he does not then acquire the right to make — the sole right to make all the decisions for the child. There are then two parents. He gets to be a parent. Breyer There are a lot of complicated things. But the question, I think, is think of the child. The child is born out of wedlock. Now, if his mother was an American, he becomes an American if she's lived here for one year. If it's his father who's an American, she becomes an American only if he's lived here for, like, eight years or ten years. Now, that's the difference. And why does that make a difference? It justifies the gender discrimination. Kneedler But that's the same rule that applies if the parents are married, which is the — which is — Breyer Two — two wrongs don't make a wrong. Kneedler No, but — well, I don't think it — no one is challenging — Breyer Perhaps. Yeah, yeah, all right. I accept there are no one challenging. But I'm not asking that question. I'm asking the question of what it is — I would repeat the question — which you heard, which I think is the equal protection question at the heart of the case. And the answer that you give in your brief was some endlessly — I mean, it was very well written and brilliant. But it went into this thing about stateless persons, and then we have, like, 17 briefs that say, no, no, that wasn't what the situation was with stateless persons. And so I guess the question would be there, was it enough of a stateless person justification to warrant this gender discrimination? There's no point in repeating that. I think I've taken in that argument. I'll have to make up my mind about it. Is there anything else? Kneedler Right. Well, I mean, the first argument we're making, again, is the point of connection to the United States. And that's where the married couple comes in, because no one is challenging the requirement. Breyer. I did have Justice Kagan's question in mind when I read it. Why don't they ask the child if it would like, when it reaches the age of 21, to be connected to the United States and see if the child votes in American elections and lives here for a while? Why are they so worried about the child's parents? I mean — Kneedler Well, and they — Breyer. All right. In any case, you don't have to answer that. Kneedler No, no. The Act provides for the acquisition of citizenship at a date after birth. And those — Breyer. I mean, I don't want to argue with you on this point. I want to know if I've got the reason for saying the mother, if she's the U.S. citizen and he's born out of wedlock, need only live here for a year, but the father has to live here for like 10 years or 8 years or something like that. The real justification for that you've been able to find, and the only one you've been able to find, has to do with this thing about stateless men. Kneedler No. No.  Breyer. Okay. Kneedler We have two reasons. The first one is the connection to the United States, which is evident on the face of the statute. When the father legitimates, what the statute does is treat the couple as if they were married. In fact, in this case, the child was legitimated by marriage. And what the statute basically did was make the marriage retroactive to the date of birth. Breyer. I'm going to make an example where they're never married. They like living together without being married. Now what's the justification? Kneedler Well, under the 1986 amendments, it is easier for the father to acknowledge the child. But in that situation, again, there are two parents. And in that situation, the father does not get to make unilateral decisions about the child. He gets to be a parent, too. He doesn't get to be the only parent the way the mother is the only parent before legitimation. And this is true in Lehrer v. Robertson and the cases this Court has had in the domestic context. Ginsburg. Mr. Kneedler, you're giving a sophisticated rationale. But we're talking about legislation from 1940 and 1952. At that time, the statute books were just shot through with distinctions between children born out of wedlock and the affiliation with the mother and the father. So this was a piece with all that legislation. And it wasn't until when Ms. Trimble against Gordon. It was typical. The Illinois probate code said a child born out of wedlock can inherit through an intestate succession from the mother only, not the father. The laws just put mothers and children not born of a marriage together and separated fathers from their children. And nobody thought until the 1970s that that was a violation of equal protection. But in a whole series of cases in the 70s, the Court recognized that, indeed, there was a violation of equal protection. Kneedler. Insofar as there are two equal protection arguments that have been made in cases like that. One of them has to do with equal protection on the basis of illegitimacy. That claim is not raised here, and with good reason, because Respondent, as an alien by statute, did not have constitutional rights. So it's the parents' rights. My point was that the laws that existed put mothers and children born out of wedlock together and separated fathers from their children. Right. No matter what the reality of their life was. And in this Court's decision in Fialo in the immigration context, that was exactly the situation. And the Court rejected equal protection claims based both on sex discrimination and on illegitimacy. That was not a claim of citizenship. It wasn't. But we think, if anything, it follows a farsharari, because citizenship is entry into the citizenry, the membership of our society on a permanent basis with rights to come and go, with all the rights and obligations. But I also wanted to address your question with respect to the domestic context. This Court's decision in Lehrer v. Robertson sustained a situation where you – where a child was going to be put up for adoption. The mother would ordinarily have the sole right to decide that, but the situation was, what about the father? Well, the father had to take some affirmative steps to put himself in a position where he could have a role, essentially a veto power. As his father did. His father, didn't the couple marry? Yes, they did. But, again, at that point, he is not similarly situated to the mother, either at the time of birth or at the time he legitimates. Mr. Kneedler, can I ask you this question? If the Court thinks that this statute violates the Equal Protection Clause, does it necessarily follow that the Petitioner is entitled to the relief that was awarded to him by the Second Circuit? In other words, the granting of citizenship. No, it by no means follows. Well, could you address that? We had a similar issue a few terms ago in the Flores v. R. case. But that was a criminal – there, what was at issue was a criminal conviction. Here, criminal convictions are not at issue. The criminal convictions have nothing to do with alienation. Is that correct? Right. The underlying criminal convictions. Right, right. No, they were regular State law convictions. I take it that the thrust of Justice Alito's question is, what is the remedy? If we level up, then it's easier for both. If we level down, then it's harder for both. We think the Court clearly should not apply to the U.S. citizen father's, the one-year limitation. The general rule, 1409C, is an exception to a general rule that governs the vast majority – the three categories of cases, married fathers, married mothers, and unmarried fathers. There's no reason to think that Congress would have wanted unmarried fathers to have a more generous grant of citizenship. Well, one I could think of, possibly. But I'd like your opinion about it. How many do you think unmarried fathers there were in 1952 who couldn't qualify under the long period of time, eight years? And that's not so hard to do if you're in the Army, because all your active duty counts. But they would have qualified under the one year. Now, I used the numbers in your brief, which were brilliant of you to try to find. I don't know how you found those. But that 4000 number kept coming back. I thought maybe there were a couple of thousand a year. But do we know that there are more than a couple of thousand? I thought you said they're untold numbers. No, they're untold numbers, but that's true. They're untold numbers, and then that's not told. So I'm trying to find how close we could come as a guess. It's very hard to estimate. But this Court's decision in Nguyen identified the number of people who travel abroad, and the numbers are a little bit higher even now. Let's go back to 52. It's like 70 million or 60 million trips abroad. Let's go back to 52. And the couple is unmarried. And it's a father who, in fact, would qualify if he only had to live here for a year. But he wouldn't qualify if he had to live here for eight years before the baby's born. Never marries the baby. Never marries the mother. Okay. So I'm thinking, who could those people have been? They would have been people maybe working for American businesses or something, and there weren't that many at that time. So I used your 4,000. That perhaps was not right. We have wondered the same thing. The only thing we were able to identify, and this is really not very closely on point, but the State Department told us that today they grant approximately, I think, 8,000 certificates of birth abroad. And of those, I think around 3,000 are under 1409C, which means that those are the ones granted to U.S. citizen mothers abroad. The number of fathers who might benefit could be far larger than that. I'm sorry. Were you finished? Yes. We generally have a rule that when we find an equal protection violation, we level up rather than level down. That's been the Court's consistent practice. Wouldn't you agree? That's been its practice, yes. But the Court has made clear that that is not constitutionally compelled, and there are compelling reasons here not to do that. Well, I find one compelling reason to do it, and I just thought I'd offer this up to you and see what you have to say, is that in this case, unlike in some cases, there really isn't a choice between leveling up and leveling down in one sense because if you level down, this party gets no relief. In other words, you say, well, you just apply it prospectively, but then this party gets absolutely no relief. And so isn't that a problem? Isn't it kind of the same problem as Justice Harlan recognized in Welsh when he was dealing with a criminal matter? He said, you know, you can't level down because you can't give everybody the exact same benefit. So how do we deal with that? Well, several things. In this context in particular, there are serious questions about whether the Court can, but at the very least substantial reasons why the Court should not grant citizenship to someone, effectively grant citizenship to someone to whom Congress itself has not granted it. It's granting citizenship. It's excising the unconstitutional part of the statute. But it would have that effect. And in a situation like this, we think the only proper remedy, given Congress's plenary authority, is to apply the 10-year rule to everyone and let Congress step in and address the problem. If Petitioner's parents had been married, would he be entitled to relief? No. And that's the point. And another point is there are other situations in which the Court finds a constitutional violation but does not grant relief. The qualified immunity context or the exclusionary rule, the Court might adjudicate a violation. So if we were to level up, we would... Oh, go ahead. If we were to level up, the effect would be that Petitioner would be given preference over someone who was similarly situated except for the fact that that person's parents were married. Yes. And if such a person were to then bring a suit, they would have a strong equal protection claim, would they not? I hesitate to say that they... But that illustrates the problems of the remedy. The claim is gender discrimination. And married parents, they've both been... Mother and father have been treated equally badly. But when they're unwed, the mother is given a preference and the father is not. So we're talking about equal protection, not qualified immunity. You have two people similarly situated, they have to be treated equally. The unwed father is equal to the unwed mother. The married mother equal to the married father. So... My only point was that there are situations in which the Court has found a constitutional violation but not granted relief. But not really a situation like this. Not a situation where we say, there's an equal protection violation and if we extend the benefit to everybody, we can take care of that equal protection violation, we can remedy the problem. But if we do not, if we try to level down, the effect of that is that the party before us who has proved an equal protection violation gets absolutely no relief at all. I'd like to answer that quickly and then reserve the balance of my time for rebuttal. I think it's also relevant in taking into account the remedy that this is not Respondent's own constitutional right. It's a third party claim. There's no automatic right to raise the rights of third parties, in this case, the father. So I think that would properly be taken into account in deciding whether a remedy at all is feasible and what it would be. Thank you, Counsel. Mr. Broom. Mr. Chief Justice, and may it please the Court. Respondent's father was a citizen of the United States. Holding other things constant, had he been the mother instead of the father, there would be no question that he transmitted citizenship to Respondent under Section 1409. That the statute bars him from doing so on the same terms as a mother is not based on any innate or biological difference between men and women or mothers and fathers. Nor does it ensure an interest in reducing statelessness or nor does it serve an interest in reducing statelessness or ensuring that citizenship by descent pass only to those children who are likely to learn American values. Both of the government's justifications for the gender differential at here therefore fail. I'd like to begin by addressing the standard of review. There is no dispute here that Respondent has third party standing to assert the equal protection claim of his father. That claim plainly is subject to intermediate scrutiny. In Fialo v. Bell, this Court applied rational basis review to the claims of aliens who were seeking visas based on their relationship to a U.S. citizen relative. It is true, as the government points out, that the Fialo plaintiffs included a U.S. citizen father, but the Court in Fialo disagreed with the dissenting justices and with the plaintiffs that his equal protection rights were at stake. And there was never any question that the aliens in that case were not U.S. citizens. Here, the dispute is one of the dispute centers on a right of Respondent's father to be treated equally to transmit his citizenship on the same terms that a mother could transmit citizenship under section 1409. I would say at some point the problem that worries me the most is assuming this is unconstitutional. You put the 14 years or whatever it is, the 10 years on both or the one year on both. And I want to because he does have a point. You put the one year on both and then you have when the parents are married it's the 10 years and when they're not married it's the one year and that really doesn't make much sense. So I hope you'll get to that and in the course of that I read an amicus brief that bothered me a lot and it said actually the one year requirement is tougher and the reason it's tougher it says that the State Department administers it. How they do this, I don't know and I want to know if that's really true but they administer it to say that if you are living in the United States you have to live here for one year and if you set one foot across the border to get a drink of water at Niagara Falls you don't qualify and moreover you have to prove that you never did set one foot to get a drink of water. Well, nobody could prove such a thing. So I'm interested in that word continuous and how it is actually administered. Those are the two things that are worrying me in respect to remedy. Justice Breyer, let me address the last question first. The word continuous I do not think is going to as a practical matter it can't be applied in a way that somebody would have to come forward and prove that they were in the United States for 365 days. They would not have to show proof that they were actually in the United States on each of those days. So I ask you that question that is your answer and maybe if the Solicitor General has time he could simply confirm that answer by saying yes. Let me tell you how it was applied in this case. So this case when we were in the Court of Appeals the Court remanded the case to the Western District of New York for a determination on that very question whether or not in order to decide whether the Court should address the constitutional issue the Court first asked whether Respondent's father would have satisfied the one continuous year rule. So we went to the Western District of New York and we were not the government ultimately stipulated that yes because we have evidence of Respondent's father being in the United States or in this case an outlying possession from his birth in 1900 until the date of his departure for the Dominican Republic in 1919 we will presume that there is at least some period in there where he was in the United States for one continuous year and I think that that presumption would apply in most cases. It certainly was applied in this case we would not have to come forward and show proof that he was in the United States on every single day. But I think if the Court were troubled that perhaps that rule could be harder for some fathers or some people to follow. An alternative remedy could be to leave both options on the table. If we leveled down and made it harder would that affect the status of people who obtain citizenship under the more lenient provision of applicable to the mother? Justice Kennedy, if this Court applied the leveling down remedy in a way that in a way that would actually equalize the two similarly situated classes here, it would have to yes, it would impact people dramatically because it would take citizenship away from people who already have it. Well, it's not necessarily true. I assume it can be prospective because once you have citizenship we have cases that say it can't be taken away. Right, and you can't So it would just be prospective by reason of that doctrine. You could not apply a prospective remedy in this case Justice Kennedy because it would not affect anybody whose citizenship was governed by the 1952 Act. It would not affect Respondent's father. Anybody who was born between 1952 and 1986 the two I mean the problem isn't it Mr. Broom that the very inequality that you are complaining of would remain because it's impossible to claw back everybody else's citizenship so it's really impossible to level down and the very inequality that we've just found would remain. That's right, Justice Kagan. The government's proposal of a prospective remedy is no remedy. It would not affect it would leave in place all of the gender discriminatory effects caused by this statute. Right, it's not just that it doesn't give you citizenship it's that it doesn't cure the inequality at all whether by leveling down or by leveling up. That's right, Justice Kagan. And the government I would submit that the government's position would have to be the same if this was a case of race discrimination. The government would have to say that yes if the citizenship statute discriminated on the basis of race this Court would be powerless to correct the residual effects of that racially discriminatory statute. The Court, we're not aware of any case in which this Court has said it is powerless to correct a case of race discrimination or gender discrimination or any equal protection violation. What about the argument that in most of the cases where a benefit was extended the group to which the benefit was extended was a smaller group than the group that already got the benefit. And here if you add in married parents then most people are under the more difficult rule 10 years or whatever it is and it's the smaller group that gets the benefit. Right. So you'd be extending a benefit enjoyed by a smaller group to a larger group. Well, we're not asking for the remedy we would propose Justice Ginsburg would not affect marital couples. And the government has pointed out Would you have an anomaly then that parents who are not married are preferred to parents who are married? It does appear at first that there is an anomaly there but I would submit Justice Ginsburg that that anomaly is built into the statute as we see it today. If you take the case of the unmarried mother if she marries the father the day before the child is born the 10 year requirement applies. If she marries the father the day after the child is born the one year requirement applies. Well, that's true Isn't it something else when we devise a remedy that deepens and extends an equal protection violation? Have we ever done that? Well, I don't think the court would be extending the equal protection violation. I think that the Whatever it is, it wouldn't be a gender discrimination. It wouldn't be. It could possibly be a legitimacy discrimination. But I think that that Well, it would be a legitimacy discrimination if we have now the laws that have what are they subject to? And the case, the past cases have involved discrimination against the children of unwed parents. What is the standard of review there? It's also intermediate scrutiny. And have we ever said that there would be a different level of scrutiny if the discrimination was against children who were born to married parents? Would you make that argument? No, I wouldn't make that argument. But I think that that claim, that legitimacy claim could be brought by people today. People who are born to unmarried United States citizen mothers are subject to that. Children who are born to unmarried mothers, but not to children who are born to unmarried fathers. And you would extend the problem. You would have this Court extend the problem. That same claim could be brought today. The only difference is whether or not it could be brought by the child of a mother or a father. But I think if you go to the heart of the equal protection violation here, the fact that there may also be a legitimacy discrimination going on does not eradicate the equal protection violation. I think the two similarly situated classes here are unmarried United States citizen fathers and unmarried United States citizen mothers. And it could be, Justice Alito, that Congress had good reasons for treating non-marital children more leniently than, at least in the case of mothers, than marital children. Because historically, non-marital children were a much more vulnerable class. They were the bastards. They were the illegitimate. And they didn't have the same kind of rights. And until 1940, in fact, they didn't have a statutory right to citizenship. So there could be logical reasons for illegitimacy. And you think that was Congress's intent in 1952? I think in 1940, when this separate... In 1940, you think that was Congress's intent? I think that in Congress's intent, what we've seen from the historical record, Justice Alito, is that in 1940, when Congress passed this statute, it was concerned about non-marital children being separated at the borders from their guardian parents. The problem is that Congress assumed, or the administrative officials who drafted this statute assumed that the guardian parent was always going to be the mother. I mean, you can conceive the possibility of members of Congress in 1940 or 1952 taking the floor and arguing, you know, we need to discriminate against the children of married parents and in favor of the children of unmarried parents. No, I don't think that's what was going on at all. They were giving... The one thing I think is they were giving a benefit to the unmarried mother. That's correct, Justice Ginsburg. Because they thought she was different from the unmarried mother. They presumed that she would be the... That is a reflexive assumption that the mother at that time, it was a reflexive assumption. I don't think it's as true today. But that the mother was going to be the guardian parent and they wanted to make sure that the physical presence requirements that Congress was passing were not going to have the impact of separating that non-marital child from who they presumed to be the guardian parent. Suppose there were some statistics that would indicate that over 100,000 new citizens would qualify, or new persons would qualify for citizenship if we adopted leveling up. Would that affect our... Should that affect our decision? I don't think it should, because at the end of the... And it would play the game 200,000... Ultimately, I think the Court has to decide whether or not there is an equal protection violation here, whether or not Congress... Well, but don't we have to consider what the Congress likely would have intended? Yes. And I think what the record shows is that given Congress's purpose here, in fact, if you take either the purpose that we have argued was the purpose of Section 1409 and the purpose that the government has argued, the statelessness purpose, both of those purposes are served by the remedy we propose, by extending the benefits to unmarried fathers. Mr. Brown... I'm sorry. If we leveled up, how would that affect children who were born to a citizen father who were previously denied citizenship? Could they come in and claim citizenship now? Only if they satisfied all of the other statutory requirements. Which means? The answer is yes. Yes, if they satisfied the other statutory requirements. The continuous one-year... And the legitimation requirement, yes. And the legitimization. More than that, I think it would be at first the father would have had to sire the child abroad, would have had to recognize the child, would have had to support the child. That's correct, yes. So I don't think that... We're talking about a fairly limited class, I think, here, Justice Ginsburg. And I would like to turn to the government's arguments about the U.S. connection interest. Before you do that, Mr. Broom, and just on the remedy question, very occasionally this Court has faced a situation when the natural remedy of something that it is holding, we're concerned a little bit about how, whether Congress would prefer a different remedy. So, for example, in the Northern Pipeline case, what we did in a situation like that was we stayed our judgment for a period of time and allowed Congress, essentially, to do it a different way if it wanted to. And I'm wondering whether you had considered that possibility here, that we could order a kind of leveling-up judgment but stay it for some period of time so that Congress could decide whether it instead preferred some other way of dealing with the problem, whether that would be appropriate. I think, Justice Kagan, first and foremost, the Court needs to remedy the equal protection violations suffered by the parties. So if that remedy, if the Court were to level up and make Respondent a citizen and then stay the judgment thereafter, I think potentially that could work. But certainly... Ginsburg. Now, I bet you the relief would have been granted to this person. This is not some kind of class action. Right. Ultimately, the Court has to decide, has to remedy the equal protection violation before it and not be thinking about, well, it is not trying to remedy an equal protection violation only in the future. And I think that is the fundamental problem with the government's remedy, is that it could only apply to unborn children and future parents, and it would have no impact on anybody who is affected by the statute at issue before the Court today. Justice Kagan's suggestion, Congress apparently should have been aware of this after our Flores-Villar case, but they were soporific. But what we have seen, Justice Kennedy, is that since the date that this discriminatory provision was first enacted in 1940, it has consistently, Congress has consistently reduced the burden on fathers. So I think if the question is, what would Congress do today, well, Congress has shown that it is continually reducing the physical presence requirements and the age calibration component of it to, so that it precludes the transfer of citizenship. Robertson, Well, but I mean, that argument seems to me that, in other words, they have considered the issue several times and at no point did they take the step of eliminating it. That's correct, Mr. Chief Justice. But they also haven't been confronted with a — the last time that Congress considered the statute was in 1986, and an equal protection challenge to these physical presence requirements was not made until the Flores-Villar case, and that was decades later. So why did you use the word today? I mean, I thought what we were supposed to do was go back and figure out if they had known that it was unconstitutional to give the unmarried woman a year requirement to live in the United States, but to give the unmarried man, where he's a citizen, eight years requirement, suppose they'd known that was unconstitutional then, what would they have done then? Is it then or is it now? Well, I think it's — It's a lot easier for you if it's now, I think. I think it is now. But which is it? Is there anything — I mean, you know you're not going to help me if you just say that, because that's in your interest to say. Is there anything that you could point to that would say it's now and not then? Well, as a practical matter, I think that if this — if the question is how would Congress remedy this statute, it can only be remedied by the Congress sitting today. Well, but that's not the question. The question is what did the Congress that passed this statute intend? And I think the answer to that — well, the question is how the Congress that passed this — if the question is how did the Congress that passed this statute, how would they remedy it today? Then I think the answer — Not how they would remedy it. Sorry. How would they remedy that statute? What would their understanding have been about the appropriate remedy when they passed the statute? I think the answer to that, Mr. Chief Justice, is that they were concerned that the physical presence requirements would create a significant burden on nonmarital children. And that is why they lowered the requirements for the mother, because they presumed the mother was going to be the guardian and they presumed that the child should stay with the mother. And they didn't want the physical presence requirements to create further burden on that relationship. To ask what the Court, the Congress in 40 or 52 would do is strange in this context, because the Court, the Congress sitting then, took gender-based lines for granted. That's right. And I think that the — if I could just sort of finish the Chief Justice's question. The — it is not clear at all that that — that the 1940 Congress would have chosen to just sever the 1409c entirely, and I think it would be just as destructive of Congress's intent to withdraw a benefit that Congress plainly intended to confer than it would be to extend the benefit that perhaps Congress did not. So do I understand you to agree that when we approach these questions, severance and remedy, that we do look to what the Congress, at the time when they passed the law, would have done? I'm not sure if there is a clear answer to that, Mr. Chief Justice. I think the Court could look at what Congress would do today and what Congress has done in the decades since. Do you find any case which supports that? No, I haven't. Any case against it? No case for it or against it, Justice Breyer. Well, you're going to find lots of cases when we address this question that talks about the intent of the Congress that passed the statute, I think. Certainly — certainly there are plenty of cases on that, Mr. Chief Justice. But the — And I don't think there are any. You haven't found one, and I don't think anyone could find one. But say, when we're looking at a question of congressional intent on a question of this, we look at the — what Congress 60 years later would have thought. But as a — if we were looking at the question — Is that true — is that true of, say, Westcott, when the category was unemployed father, and it was enlarged to include unemployed mothers? Was it true of Goldfarb, the Social Security cases? When — what Congress did when it did it was just a piece with everything where the man was the dominant person in the family, and the woman was the subordinate person. So to say you want to go back to a Congress that had that mindset and ask what they would have done is a little hard. It is difficult, and — Well, then don't pretend that you're implementing Congress's intent when you say we're going to say — we're going to put in place when we're talking about a remedy, not in terms of finding a violation. Don't pretend that you're implementing Congress's intent when you look at what Congress 60 years later would do. Well, Mr. Chief Justice, when you are remedying a gender discriminatory statute by leveling up or leveling down, you are never implementing Congress's intent. You're trying to — It's true, but you're going to ask what would they have wanted if they knew they couldn't make this discrimination. That's why I thought, well, if you have to go back to 52, they're going to either have to take the benefit away from the woman or give it to the man. And the two principles that support you is Congress hates taking away a benefit they give anybody. They get into a lot of trouble when they take benefits away. So that would move them in one direction. And it would also move them in the same direction if there are just a handful of men who might really benefit. That's why I asked that question. But nobody — but if there were millions of men who might benefit, then they might get a little worried about what they're doing, particularly since they're discriminating even more, you know, the other way, against the married couple. So that's why I was interested in those questions. But I take it you have said pretty much what you can say on that. As to Congress's intent, yes, Justice Breyer. As to the number of people, all you can say is they would have to meet a lot of requirements that you'd have to be a U.S. citizen, sired a child abroad, recognize that child, supported that child. I don't know.  We are talking about, I think, a fairly limited class. This is just children who are born outside of the United States to unmarried United States citizen fathers who cannot satisfy the 10-year requirement, but they can satisfy the 1-year requirement. So they're somewhere in that 9-year period. I think that is the case. Sotomayor, assuming Justice Ginsburg's point that the father still has to have legitimatized the child without marriage, because if they marry the mother, they would end up having to fulfill the 5-year. So it would have to be — are you accepting her proposition that the father has to legitimatize the child? We're not — we're certainly not challenging the legitimation requirement. Ginsburg. That's statutory and also the support requirement. Now, they may be independently challengeable, but they are. And I think in this case they could be, because this is a different requirement than what was at issue in the Wynn case. In Wynn, the Court addressed a paternal acknowledgment requirement and said, well, that is a minimal burden for the father to satisfy. He can — he is not similarly situated with respect to biological proof of his relationship with the child, but the requirement that he then come forward and take some affirmative step to demonstrate that by acknowledging the child, that is — that satisfies intermediate scrutiny. But here we're talking about a legitimation requirement. And if, as the historians have pointed out, the historian amicus brief points out, that legitimation really meant marriage, then that is a much more significant burden placed on the father, because the father may not be able to — may not be able to satisfy the requirement at all. For example, if the mother — the mother is not around — not available, if she doesn't want to marry the father, or if she is dead, then that — Or if he is already married. Or if he is already married. Where is the legitimation requirement? I said 8 U.S.C. 1409C. It doesn't say a word about legitimation. It's in 1409A. Well, 1409A doesn't apply. This is notwithstanding subsection A. Right. And so the remedy is — This is notwithstanding subsection A, somebody who is born outside the U.S., out of wedlock, shall be held to have acquired at birth the nationality status of his mother, if the mother is a U.S. citizen, and had been physically in the United States for one year. So I don't see anything that says they have to be legitimized for the mother to get  In 1409A, it applies only after there has been — In 1409A. And what the first words of C are, notwithstanding the provision of subsection A. Anyway, I guess I could figure it out later. Well, no. Let me see if I can try and help you, Justice Breyer. The remedy imposed by the court of appeals is to, as 1401A.7, which is the physical presence requirement, the ten- and five-year physical presence requirement, the court of appeals, that applies through 1409A. 1409A is the provision that applies to fathers. So the remedy would be to apply the one-continuous-year rule in 1401A.7, and I grant you this is complicated, 1401A.7 as it applies through 1409A. And that would put mothers and fathers on equal footing with respect to the physical presence requirements. And then the legitimation requirement still applies to fathers. But if I could address the government's U.S. connection interest in my time remaining. The statute here absolutely bars a U.S. citizen father under the age of 19 from transmitting citizenship to his foreign-born child, even if the father spent his entire life in the United States up until the day the child is born. And even if the father legitimates the child and seeks to raise the child in the United States. By contrast, the statute automatically confers citizenship on a child whose U.S. citizen mother spent only a year of her life at any point in her time, at any point in her life, even during infancy, and even if the mother marries the alien father and then the child is raised by the mother and the alien father. It is impossible to view a statute that permits these results as related to a U.S. connection interest. And I would submit, Your Honor, that the statelessness interest does not justify the discrimination either. There is no dispute here that the statute creates a risk of statelessness for children born abroad to unmarried United States citizen fathers who legitimate their children but who cannot satisfy the 10 and 5-year physical presence requirement. And the statute, the statute confers citizenship on a child born abroad to an unmarried United States citizen mother, even if that child faces, even if her child faces no risk of statelessness at all because she is born, the child is born in a country that assigns citizenship by virtue of being born there. Sotomayor, we are leaving children uncovered whose mothers have not had a continuous 1-year residency in the United States, even though that mother may be an American citizen. That's right. But my point is that her child may have no risk, face no risk of statelessness at all, and yet the statute still confers citizenship. No, I just said they do. Because the mother can only pass on citizenship if she's been in the United States continuously for 1 year prior to the birth of the child, correct? That's correct. So what happens to a citizen mother who can't meet that 1-year requirement? What happens to her child? That child could be stateless. That child would not get. So there is a risk of statelessness no matter what? There is a risk of statelessness, but that risk of statelessness is created by these physical presence requirements that Congress chose to impose, whether it's the mother or the father. The risk is greater with respect to the fathers. It is lesser with respect to the mothers. But it is these physical presence requirements that create the risk of statelessness. And therefore, this scheme cannot be justified as seeking to reduce a risk of statelessness. If the Court has no further questions, thank you. Roberts. Thank you, counsel. Three minutes, Mr. Kneedler. Kneedler. Thank you, Mr. Chief Justice. First, on the merits. The provision here furthers two substantial governmental interests. At the time the child is born and there is only the mother as a recognized parent, it is uncertain whether the child will ever be legitimated. Congress has a substantial interest in conferring citizenship on that child at birth if it concludes that there is a sufficient connection to the United States. Congress also has a substantial interest in not divesting that child of citizenship if the child is later legitimated by an alien father. So there are two substantial interests that are furthered, and it is precisely tailored to take care of those two interests. But if you're concerned about the stateless children in the world, then if you have a problem with the father who can't transmit his citizenship in a country where women's citizenship goes by, who is the father? Kneedler. Well, if the father later legitimates, he's put in the same position as if they were married at the time the child was born, and we know from 1401 that that is a child. Today there are lots of fathers who do look after their children. I don't say they do it perfectly, but they try. Now, suppose just the words you said, take the same words, just put in father instead of mother, and today, why is it any different? It isn't different. I just want to repeat again. When the father legitimates, there are two parents. In Lehrer v. Robertson we're getting – I'm not talking about legitimacy. I'm talking about the ones – a surprising number of people, unfortunately, never get married. And a lot of them do live abroad, and they do have children. Well, certainly – That's why I'm focusing. Certainly – Your words applied where it was the mother. And all my question is, couldn't you put the same words and apply it where it is the father? No, I – it is – I think it's of critical importance in citizenship laws to have a legal occurrence in order to pass citizenship, and that's legitimation. Your suggestion that you could – that the father could pass on citizenship without even legitimation, which this Court basically sustains.  Doesn't C say that? Yes, but this is a question of remedy and to – but – and also in Lehrer v. Robertson, if the father filed a notice – or filed a document and got notice of the proceeding, he didn't get the veto power that the mother had before legitimation. He just got to be a parent, too. And that's exactly what happens here. When the father legitimates, he's not put in the same position as the mother because there are two parents. It's a two-parent family. With respect to remedy, let me point out at page 38 of our brief where the statelessness is addressed, it's clear the interests that I identified, that Congress wanted to ensure that the child would have citizenship at birth and not be divested. Thank you, counsel. The case is submitted.